O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT V. A.,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,[1]<br><br>　　　　Defendant. | Case No. 2:18-cv-06285-KES<br><br>MEMORANDUM OPINION AND ORDER |

**I.**

**BACKGROUND**

In 2015, Albert V. A. ("Plaintiff") filed an application for disability insurance benefits ("DIB") alleging a disability onset date of July 12, 2010.[2]

---

[1] Mr. Saul was sworn in as Commissioner of Social Security in June 2019. See https://blog.ssa.gov/social-security-welcomes-its-new-commissioner/. Accordingly, he is substituted for Ms. Berryhill pursuant to Federal Rule of Civil Procedure 25(d).

[2] Plaintiff testified that his employer, Sony, laid him off on July 12, 2010. See AR 58-59. He then had finger surgery on July 16, 2010, which is the date he alleged at the hearing as the date of onset. See AR 59-60.

Administrative Record ("AR") 180-91.

On April 20, 2017, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was unrepresented, appeared and testified, as did a vocational expert ("VE"). AR 47-88. On August 16, 2017, the ALJ issued a decision denying Plaintiff's application. AR 15-39.

The ALJ found that Plaintiff suffered from the medically determinable impairments of left shoulder labrum tear, history of left index finger surgeries, and cervical spine stenosis. AR 20. Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with limitations, including feeling, grasping, and fingering only frequently. AR 25. In Social Security terminology, the term "frequent" means between one-third and two-thirds of the workday. See Social Security Ruling ("SSR") 96-9p, 1996 WL 374185; SSR 83-10, 1983 WL 31251.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could do his past relevant work which the VE and ALJ called a "systems analyst" but which the DOT describes as a "computer programmer."[3] Dictionary of Occupational Titles ("DOT") 030.162-010; AR 34, 81. This position involves sedentary work, Level 4 – Lowest 1/3 Excluding Bottom 10% finger dexterity, and frequent handling and fingering. Per the DOT, a systems analyst converts data to create or modify computer programs. The ALJ therefore concluded that Plaintiff was not disabled. AR 35.

---

[3] A "systems analyst" is DOT 030.167.014 and involves sedentary work, Level 4 fingering dexterity, occasional handling, and frequent fingering. Neither party alleges that the VE or ALJ incorrectly identified Plaintiff's past work for Sony as corresponding to the DOT's description of a "computer programmer," even though Sony called him a "systems analyst." Nor does Plaintiff identify any differences between the two job descriptions that would have any effect on the ultimate disability determination.

## II.

## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006). Plaintiff bears the burden of establishing that the ALJ's decision is based on prejudicial legal error. Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (court may not reverse absent a harmful error, and plaintiff bears burden of establishing that an error is harmful).

# III.
# ISSUES PRESENTED

Issue One: Whether the ALJ erred in evaluating the medical opinions. Plaintiff contends that the ALJ failed to give specific, legitimate reasons for discounting the left-hand limitations of treating physician Dr. John Knight and examining physician Dr. Trevor Lynch. (Dkt. 22, Joint Stipulation ["JS"] at 4.)

Issue Two: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony about chronic regional pain syndrome ("CRPS"). (JS at 4.)

# IV.
# DISCUSSION

A. **ISSUE ONE: The ALJ's Evaluation of the Medical Evidence.**

   1. **Rules for Weighing Conflicting Medical Opinions.**

   "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted); see also Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." (citation omitted)).

   2. **Summary of Relevant History and Medical Treatment.**

   On December 22, 2008, Plaintiff slipped and fell during a team-building activity, for which he blamed his supervisor and her young daughter, who had

"charg[ed] playfully" at Plaintiff, causing him to step back and slip on wet ground.[4] AR 340. An X-ray of his left hand showed that his third finger was bruised and his index finger had a fracture.[5] AR 341. He received a finger splint and Vicodin. Id. About a week later, a doctor placed him in a cast that he wore for one week, and he also received hand therapy for a week. Id. Several months later, after he complained of pain and loss of motion, an MRI revealed "unspecified" abnormality, and a doctor recommended physical therapy. Id.

Plaintiff continued working but from home. AR 313. He reported that he performed his job "effectively" when at home, even though he was only using his right hand to type, needing an additional ten hours a week to complete his work. AR 323.

Plaintiff requested another opinion, and on July 28, 2009, Dr. Coleman recommended surgery. AR 341. On November 10, 2009, Dr. Coleman performed "left index finger proximal interphalangeal joint volar plate arthroplasty." Id. Plaintiff was on temporary total disability to recover from surgery from November 9, 2009 until February 3, 2010. AR 313. He received 18 sessions of post-operation physical therapy. AR 341.

In March 2010, Plaintiff and a number of other employees received word that they would be laid off due to their duties being outsourced, with the layoff occurring on July 12, 2010. AR 58-59, 385. On July 16, 2010, Dr. Coleman performed "left index finger proximal interphalangeal joint arthrodesis with

---

[4] Leading up to the fall, Petitioner felt that his supervisor was "placing increased responsibilities on her employees and expecting work to be completed within a timeframe that was unreasonable," and was unavailable much of the time, making it harder to get work done. AR 381-82. After the fall, his relationship with her deteriorated, because he resented her for "coercing" him to attend the activity and for bringing her daughter. AR 383.

[5] There are no medical records in the AR predating 2010. These citations are to later records that refer back to past events or records.

cannulated screw." AR 341.

On January 10, 2012, Plaintiff had surgery to remove hardware from his left index finger and had a bone spur removed. AR 470-71.

In July 2013, Plaintiff presented to the Hand and Wrist Institute ("HWI") complaining of hyperextending his right thumb; MRIs of that hand were unremarkable. AR 505-06, 519-20. He did not complain of any pain in his left hand. See id. He visited the HWI again in December 2013 complaining of right thumb pain and did not complain of pain in his left extremity. See AR 507.

On January 13, 2014, Plaintiff complained of pain in his left index and middle fingers and reported that he was on no medication. AR 509-10. On June 13, 2014, he complained of pain and loss of use of his left index and middle fingers, but on exam, he had only moderate and mild tenderness in his left index and middle fingers, respectively, with flexion limitations in his left index finger and full range of motion in his other digits and wrist. AR 511. He was prescribed an anti-inflammatory drug. Id. On July 15, 2014, Plaintiff again complained of left index finger and middle finger sensitivity. AR 513-14. A July 19, 2014 MRI showed "post-surgical changes of the proximal interphalangeal joint of the second digit related to prior fusion with slight flexion deformity," as well as "tiny" and "small" "erosions of the second and third metacarpal heads," respectively. AR 517-18.

On July 25, 2014, Plaintiff presented to the Pain and Health Institute ("PHI") and alleged that he was "unable to use his left hand" due to pain in his left index finger and wrist. AR 529. He received a diagnosis of CRPS and a ganglion block, but he complained in late August 2014 that there was no pain relief. AR 529-32.

On August 27, 2014, Plaintiff returned to HWI reporting his CRPS diagnosis and ongoing pain. AR 515-16. On exam, he had mild tenderness of the left index finger; the assessment was sprain/strain of the carpal joint of the left wrist and status-post industrial injury of the left hand. Id.

On November 19, 2014, Plaintiff returned to PHI and reported that a hand specialist told him that further surgery was not an option; he was advised to consider the ganglion block and a thoracic epidural. AR 533-34. He returned on March 17, 2015, alleging right hand and left leg symptoms; he had not started physical therapy for his CRPS and his gabapentin was increased. AR 535-36.

### 3. ALJ's Analysis of Medical Opinions.

As part of Plaintiff's Worker's Compensation claim, Dr. Lynch examined Plaintiff on June 29, 2012. AR 472. Dr. Lynch had examined Plaintiff on two previous occasions (November 5, 2010, and September 23, 2011), and Dr. Lynch had recommended removal of a bone spur. AR 473. A left hand exam showed that the left index finger was fused in 30 degrees of flexion (65 degrees with pain), and the middle finger was nontender. AR 477. Grip strength was 95 pounds on the dominant right hand and 40-50 pounds on the non-dominant left hand. Id. Dr. Lynch referred to X-rays of the left index finger that showed healed arthrodesis in 30 degrees of flexion. AR 478. Dr. Lynch restricted Plaintiff's use of his left hand to "repetitive activities not to exceed 30 minutes per 60 minute session," no lifting of more than 5 pounds, and no forceful gripping, grasping, pushing, or pulling. AR 479.

Dr. Knight appears to have first seen Plaintiff in July 2013 at HWI for right thumb pain after Plaintiff hyperextended his thumb when opening a door. AR 505, 507. Dr. Knight first noted Plaintiff's left finger complaints in January 2014, when Plaintiff stated that he would like to have his disability papers filled out for private insurance since he was no longer seeing industrial doctors. AR 509. Dr. Knight noted "diffuse [proximal interphalangeal, or "PIP,"] joint left index finger with mild flexion" and "minimal [distal interphalangeal, or "DIP," joint] flexion" in his left index finger with full range of motion in all remaining digits and wrist.[6] Id.

---

[6] In the finger, the DIP joint is the first joint after the fingernail. The PIP joint is located at the middle of the finger. The metacarpophalangeal, or "MCP"

Dr. Knight wrote, "This patient is permanently disabled . . . with no longer perform frequent computer use throughout each work day [sic]." Id. In June 2014, Dr. Knight noted that Plaintiff continued to have "significant sensitivity" at the left index finger PIP joint and to a lesser degree in his left middle finger PIP joint. AR 511. Dr. Knight wrote that Plaintiff was "unable to perform any significant typing with the left hand" and was "precluded permanently from repetitive use of the left upper extremity." Id. In July 2014, Dr. Knight recorded Plaintiff's continuing complaints and on examination wrote that Plaintiff exhibited "mild tenderness" in his left index and middle finger, but his middle finger had full range of motion. AR 513. He ordered an MRI, which showed a "tiny erosion" of the radial aspect of the second metacarpal head, a "small erosion" of the radial aspect of the third, postoperative changes within the second digit with extensive metallic artifact, no areas of abnormal signal in the thumb or third, fourth, or fifth digits, no tendon tears or soft tissue masses, no evidence of active synovitis, and as an impression, "slight flexion deformity" of the second digit. AR 517-18. In August 2014, Dr. Knight noted mild tenderness diffusely in the left index finger, and noted that the MRI had shown "a PIP arthrodesis with inflammation at the MCP joint of the middle finger."[7] AR 515.

Dr. Buljubasic examined Plaintiff on May 4, 2015. See AR 545-51. While Plaintiff complained of "crushing pain" from 7-8/10 to over 10/10 in his left index finger, and 8/10 pain in his right wrist and right thumb lasting one week every

---

joint, is located at the base of the fingers, where the hands and fingers join. Put differently, a ring would need to fit over two finger joints: first the DIP joint and then the PIP joint. The ring would rest right above the MCP joint.

[7] In July 2010, Dr. Coleman had performed "left index finger proximal interphalangeal joint arthrodesis." See AR 341. "Arthrodesis" is the surgical immobilization of joints in order to lessen pain. See https://www.webmd.com/osteoarthritis/guide/joint-fusion-surgery#1.

8

other week, he admitted to Dr. Buljubasic that he could grocery shop, vacuum, dust, denied difficulty with self-care, and could lift 20 pounds with his left hand. AR 545. Upon examination of Plaintiff's left hand, Dr. Buljubasic noted that Plaintiff had tenderness to palpation over the left index finger with severe tenderness to touch and was unable to make a fist with his left hand due to inability to contract completely the left middle and left index fingers.[8] AR 549. Dr. Buljubasic found that Plaintiff had full range of motion and full grip strength of the dominant right hand. AR 548-49. Dr. Buljubasic concluded that Plaintiff could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently, could sit, stand or walk for up to 6 hours per workday, and could perform frequent feeling, grasping, and fingering with the left hand with no manipulative limitations of the right hand. AR 550. The ALJ gave persuasive weight to Dr. Buljubasic's opinion. See AR 32-33.

### a. Dr. Lynch.

The ALJ did not list Dr. Lynch by name but referred to his report by exhibit number. AR 31-32 (citing AR 472-78). The ALJ concluded that Dr. Lynch's 2012 opinion was "minimally persuasive," because: (1) the objective imaging reports were not included or evidenced, despite the claimant bearing the burden of proving his impairments with "medical imaging, clinical, and other diagnostic methods"; (2) causation and apportionment have no merit in a Social Security disability determination; (3) Dr. Lynch did not address relevant issues such as Plaintiff's RFC, ability to sustain his past work, and ability to sustain other competitive work; (4) the evaluation was over 5 years old at the time of the hearing; and (5) the objective medical evidence did not support Dr. Lynch's opinion. AR 30-32.

Plaintiff first argues that, under 20 C.F.R. § 404.1512, it was incumbent

---

[8] Plaintiff mistakenly claims that Dr. Buljubasic found that the middle finger would not bend. (See JS at 12.)

upon the ALJ to contact Dr. Lynch if he wanted the X-rays.  (JS at 6.)  Plaintiff points out that he was unrepresented at the hearing, and that Dr. Lynch's report of the X-rays' contents did not appear "excessive or unreliable."  (Id. at 5.)  Plaintiff also argues that the "causation and apportionment" reason is not relevant to Dr. Lynch's opinions on Plaintiff's functional limitations, and that Dr. Lynch did opine on some functional limitations—specifically, in Plaintiff's words, that Plaintiff could use his left hand "only 50% of the day" and could not lift over 5 pounds.[9]  (Id. at 6.)  The Court need not address these issues, because the ALJ provided other specific and legitimate reasons supported by substantial evidence for discounting Dr. Lynch's opinion.

First, the ALJ noted that Dr. Lynch's opinion was not supported by objective medical evidence.  AR 30.  The Court agrees.  Dr. Lynch's own report does not give any support for his extreme limitations.[10]  Despite Plaintiff's ability on examination to use all of his fingers on his left hand except for limited motion in his index finger, Dr. Lynch opined that Plaintiff was limited in his left hand to no lifting of more than 5 pounds and no repetitive activities for more than 30 out of 60 minutes, without explanation.  Plaintiff himself testified that he could lift 10 pounds with his left hand.  See AR 70.  And in May 2015, he told Dr. Buljubasic that he could lift 20 pounds with his left hand.  AR 546.  Despite Plaintiff's

---

[9] Dr. Lynch did not in fact opine that Plaintiff could use his left hand for only 50% of the day.  Dr. Lynch instead opined that Plaintiff could not engage in repetitive activities with his left hand for more than 30 out of 60 minutes.  See AR

[10] Even Dr. Lynch's 2010 and 2011 reports did not support his recommended limitations.  See AR 485 (2011 report noting "minimal tenderness" in the left index finger and no positive findings except for in left index finger), 492 (2010 report noting tenderness in index and middle fingers, with X-rays of the left hand "negative for fracture, subluxation, or degenerative change excluding the index finger," and X-rays of the left index finger showing joint space narrowing in the DIP joint consistent with some early post-traumatic degenerative arthritis but no subluxation or osteophyte formation).

complaints of wrist and forearm pain, see AR 472, Dr. Lynch recorded that Plaintiff had minimal tenderness of the left wrist, negative Tinel's and Phalen's compression tests, and a full active range of motion of the left wrist. AR 476-75. While Plaintiff's left hand key and chuck pinch strength was low, his grip strength was 40-50 pounds, see AR 477. Dr. Lynch's cites X-rays, which Plaintiff did not provide, that showed only "healed arthrodesis . . . in approximately 30 degrees of flexion" in his index finger, some "mild joint space narrowing," and a "normal" metacarpophalangeal. AR 478. Even assuming the accuracy of Dr. Lynch's description of these X-rays, these results would not account for such severe restrictions.

Second, the ALJ noted that Dr. Lynch's opinion was from 2012 and therefore five years old. AR 32. Plaintiff argues that the age of Dr. Lynch's report is not a legitimate reason to "reject" it, because it was dated after the alleged onset date. (JS at 6-7.) The ALJ did not reject Dr. Lynch's opinion but merely discounted it in favor of more recent, supported opinions and records (such as Plaintiff's two 2013 visits to HWI when he complained of pain in his right hand but did not mention his left). The regulations permit this even with regard to treating sources. See 20 C.F.R. § 404.1527(c) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source . . . . [T]he extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion."). Notably, it does not appear that Dr. Lynch ever examined Plaintiff after 2012, let alone treated him, and Dr. Lynch did not have the benefit of records post-dating his own opinion that did not support his extreme

limitations. See, e.g., AR 509-14, 545-51, 503-22; see also Ramos v. Astrue, No. CV 09-1644-OP, 2009 WL 4907048, at *6 (C.D. Cal. Dec. 11, 2009) ("The ALJ found that Dr. Schmidt's opinion was 'dated' and 'not supported by the longitudinal records in the past three years' before the hearing. . . . [T]he ALJ properly afforded Dr. Schmidt's opinion less weight, as it was dated and inconsistent with the longitudinal record.").

b. Dr. Knight.

The ALJ also did not list Dr. Knight by name but referred to his opinion by exhibit number. See AR 32 (citing AR 503-22). The ALJ concluded that Dr. Knight's opinion had "some persuasive value," noting: (1) there was an insufficient offer of objective or clinical medical evidence to confirm a "permanent" preclusion of any repetitive use of the left upper extremity; (2) other records noted full range of the motion of Plaintiff's thumb and last 2 fingers of the left hand; (3) the ALJ accommodated some functional limitations by limiting Plaintiff to frequent use of the left upper extremity; and (4) Plaintiff's admissions regarding his daily functioning was not wholly consistent with Dr. Knight's functional capacity limitation. AR 32.

Plaintiff faults the ALJ for not explaining how his ability to use a thumb and two fingers on his left hand to type "rules out" Dr. Knight's opinion that Plaintiff could not perform any significant typing with his left hand. (JS at 7.) To the Court, it seems commonsensical that a person could type (albeit more slowly) for up to two-thirds of the workday with the full use of his dominant hand and three fingers of his other hand. But the Court need not only rely on common sense. Plaintiff himself reported that he could do his job at Sony "effectively" at home while using only his right hand, spending an extra ten hours a week. See AR 323. Plaintiff reported that in that job, he was required to "write, type or handle small objects" for 8 hours or more a day. See AR 205. Thus, with the use of his right hand and the majority of his left hand, Plaintiff could presumably type for up to

12

two-thirds of an eight-hour work day.

Plaintiff argues that the ALJ's limitation to frequent use did not "adequately encompass" Dr. Knight's opinion. (JS at 7.) As the ALJ did not adopt Dr. Knight's opinion entirely, it was not necessary for the ALJ's limitations to "encompass" Dr. Knight's opinion.

Finally, Plaintiff argues that since Dr. Knight was assessing Plaintiff's limitations to activity in a work environment, Plaintiff's ability to use his left hand in daily activity does not conflict with this opinion. (JS at 7.) Plaintiff overlooks the regulations, which permit ALJs to give more weight to medical opinions that are consistent with the record as a whole. See 20 C.F.R. § 404.1527(c)(4). The ALJ need not ignore obvious inconsistencies between functional limitations related to the workday and a person's admitted daily activities. Furthermore, Dr. Knight did not explicitly restrict his opinion to the workday. Last, it is unclear precisely what Dr. Knight meant by "repetitive,"[11] but the ALJ did not err by pointing out that, to the extent that Dr. Knight's meaning conflicted with Plaintiff's admitted daily activities, Dr. Knight's opinion should be discounted. See AR 76-78

---

[11] At least one VE has testified that in California workers' compensation jargon, a restriction against "repetitive" activity equates to the ability to perform the activity occasionally. See Luna v. Astrue, No. EDCV 08-0890 AJW, 2009 U.S. Dist. LEXIS 95155, at *11 (C.D. Cal. Oct. 13, 2009). Some courts outside the Ninth Circuit have found no inconsistency in the determination that claimant cannot perform "repetitive" motion but can perform occupations requiring "frequent" motion. Williams v. Colvin, 2014 U.S. Dist. LEXIS 180961, at *10-13 (W.D. Okla. Dec. 31, 2014) (collecting cases). In an unpublished decision, the Ninth Circuit found that "repetitively" refers to "a qualitative characteristic – i.e., how one uses his hands [or other body part], or what type of motion is required – whereas 'constantly' and 'frequently' seem to describe a quantitative characteristic – i.e., how often one uses his hands [or other body part] in a certain manner." Gardner v. Astrue, 257 F. App'x 28, 30 n.5 (9th Cir. 2007). Applying this reasoning, "repetitive" finger motion would involve repeatedly moving one's finger in the same manner during the workday, such as while typing.

13

(Plaintiff testifying that every day, he wakes up and makes coffee, makes breakfast for himself and his wife, prepares his daughter's lunch, drops his daughter off at school, washes the dishes, uses the computer, goes grocery shopping, picks his daughter up, makes his daughter dinner, and also vacuums, dusts, and does laundry).

**B. ISSUE TWO: Plaintiff's Subjective Symptom Testimony.**

Plaintiff argues that the ALJ failed to provide clear and convincing reasons to reject Plaintiff's testimony about his CRPS. (JS at 14-19.)

### 1. Rules for Evaluating Subjective Symptom Testimony.

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quoting Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986)). "[T]he ALJ is 'not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina, 674 F.3d at 1112 (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, the ALJ must evaluate subjective symptom testimony "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In doing so, the ALJ may consider testimony from physicians "concerning the nature, severity, and effect of the symptoms of which [the claimant] complains." Id. at 959. If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or

other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

**2. Summary of Plaintiff's Subjective Symptom Testimony.**

Plaintiff testified that he could drive and had driven to the hearing, but he could not drive for "extended" periods of time. AR 57. He could not work due to his constant pain—pain not only in his left index finger, but in his neck, wrists, left shoulder blade, hands, and behind his left ear—and having to "lay throughout the day." AR 60-66. He "shattered" his left index finger and "tore ligaments" in his middle finger when he fell in 2008;[12] the fall also injured his neck[13] and led to his developing cysts in both wrists.[14] AR 62. On a scale of one to ten, his shoulder

---

[12] Compare AR 341 (noting that 2008 X-ray of left hand following fall showed that his third finger was bruised and his left index finger had a "fracture of the second middle phalangeal base").

[13] Plaintiff claimed at the hearing that two doctors told him that it "looked like" he had fractured his vertebrae when he fell in 2008. See AR 67. Plaintiff does not cite to any documentation or mention of this in his medical records.

[14] These may be "ganglion cysts," which are soft-tissue swellings occurring usually on the wrists. "Most ganglia do not require treatment," although they can be aspirated or excised "if troublesome." Robert S. Porter, M.D., et al., eds., The Merck Manual of Diagnosis and Therapy 388 (Merck Research Labs., 19th ed. 2011). Ganglion cysts usually are painless and in "many cases . . . go away on

15

and neck pain was between a 6 and 8 out of 10, and the pain was "fairly constant" because it occurred any time he turned his neck, was sitting, or standing, i.e., any time he was not lying down. AR 66. Plaintiff could walk a couple of blocks, stand for an hour, and felt pain in his neck if he bent down. AR 68. He had no limitations using his dominant right hand, except for lifting due to his cysts, but he could twist a doorknob with his left hand. AR 69. He believed that with his left hand, he could lift between 10 and 15 pounds. AR 70. He could sit for only an hour, with discomfort. Id.

Every day, he woke up at 6:30 a.m. and made coffee, made breakfast for himself and his wife, and prepared his daughter's breakfast. AR 76. He drove his daughter to school, came home, washed dishes, then sat on the couch " a lot" and used the computer and watched television. Id. He would go to the store for groceries, lie down for an hour in the late morning, continue watching television or call his family, then pick up his daughter, make her dinner, spend time with her before putting her to bed. AR 77. He also did housework like vacuuming, laundry, and dusting. Id.

### 3. The ALJ's Reasons for Discounting Plaintiff's Subjective Symptom Testimony.

The ALJ gave at least the following five reasons for discounting Plaintiff's extreme subjective symptom testimony: (1) Plaintiff's allegations of pain at the hearing conflicted with his allegations of pain to a physician, suggesting that his symptoms had improved despite his claim that it had not; (2) Plaintiff's admissions regarding pain level and his functioning level were inconsistent with his allegations of disabling pain; (3) Plaintiff's allegations regarding his driving were inconsistent; (4) Plaintiff's allegations regarding his social activities conflicted with his reports

---

their own." See https://www.mayoclinic.org/diseases-conditions/ganglion-cyst/symptoms-causes/syc-20351156.

of anxiety and comfort around others; and (5) Plaintiff reported spending a year in therapy at the hearing but told a physician that he had not done any physical therapy due to pain. AR 20-30. The Court considers reasons one and two, because they are sufficiently clear and convincing reasons, supported by substantial evidence, to discount Plaintiff's subjective symptom testimony.

### a. Reason One: Pain Improvement.

At the April 2017 hearing, Plaintiff alleged that pain in his neck and shoulder, which radiated down to his hand and which he attributed to his 2008 fall, was between a 6 and an 8 out of 10, despite not taking any pain medication other than Aleve due to financial circumstances. AR 29, 60-68. Yet in 2014, he alleged to Dr. Buljubasic a "crushing" and "constant" pain level of 7 to 8 to over 10 out of 10—as well as pain of 8 out of 10 in his right wrist and thumb lasting one week every other week—even though he was on prescription pain medication every day, which did not seem to help and only alleviated the pain a "little bit." AR 29, 545. This is a significant enough inconsistency to suggest that Plaintiff's pain had improved, and not insubstantially, despite his testimony to the contrary.

### b. Reason Two: Daily Activities.

The ALJ convincingly reasoned that Plaintiff's admitted daily activities belie his claim that he is unable to work at all. Every day, Plaintiff makes meals for his family, takes his daughter to and from school, uses the computer daily, and does household chores. While Plaintiff may do less activity now than he did before the 2008 fall, as the ALJ noted, he "remains fairly active for an individual who denies he has the physical capacity to sustain some kind of work activity." AR 29.

### c. Plaintiff's SSR 03-02p Argument

Within his subjective symptom testimony argument, Plaintiff implies that the ALJ erred by not finding Plaintiff's CRPS to be severe and not citing and applying Social Security Ruling ("SSR") 03-02p. (See JS at 17, citing Saffaie v. Berryhill, 721 Fed. App'x 709 (9th Cir. 2018)). (See JS at 17.) Any such error

would be harmless. SSR 03-02p governs the evaluation of CRPS and sets out how it should be evaluated. See 2003 WL 22399117. It requires that ALJs adjudicate CRPS claims using the sequential evaluation process, "just as for any other impairment." Id. In Saffaie, the Ninth Circuit held that the ALJ erred by giving great weight to a doctor's opinion that occurred before the plaintiff's CRPS diagnosis, given that CRPS can be "transitory" with respect to objective findings. Here, Dr. Buljubasic diagnosed Plaintiff with CRPS but also concluded that he perform frequent feeling, grasping, and fingering of the left hand. Furthermore, the ALJ noted Plaintiff's CRPS diagnosis and incorporated into his opinion a frequent feeling, grasping, and fingering limitations. See AR 25, 32, 550; see also Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (holding that any failure to find impairment "severe" at step two was harmless because ALJ discussed impairment in assessing RFC); Alexander v. Astrue, No. CV11-02465-PHX-DGC, 2012 WL 2848154, at *5 (D. Ariz. July 11, 2012) (holding that ALJ's failure to cite SSR 03-2p was not legal error where ALJ followed required sequential evaluation process in evaluating disability claim).

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner of Social Security and DISMISSING this case with prejudice.

DATED: July 05, 2019

_____
KAREN E. SCOTT
United States Magistrate Judge

18